# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| Pardee Homes of Nevada, <br>     Plaintiff <br> v. <br> AG/RW - Canyons, LLC, <br>     Defendant | 2:16-cv-01952-JAD-PAL <br><br> **Order Denying Defendant's Motion to Dismiss, Granting Plaintiff's Counter-Motion for Summary Judgment, Denying Defendant's Cross-Motion for Summary Judgment, and Closing Case** <br><br> [ECF Nos. 9, 13, 23] |

Pardee Homes of Nevada agreed to purchase unimproved Nevada land from AG/RW - Canyons, LLC.[1] As part of the deal, Pardee agreed to construct a water facility to benefit and be paid by both Pardee and AGRW.[2] A dispute arose about the parties' agreement to jointly pay for the water facility.[3] Pardee sues AGRW for declaratory relief to resolve that dispute.[4]

AGRW now moves to dismiss, arguing that declaratory relief is a remedy, not a claim, and, regardless, it is improperly pled because Pardee seeks to redress past wrongs and does not allege any ambiguity in the parties' agreement.[5] Each side also moves for summary judgment, arguing that the written agreement unambiguously favors its interpretation.[6]

I deny AGRW's dismissal motion because its arguments lack merit. The parties' agreement is not ambiguous and its plain language is capable of just one reading: Pardee's. So I grant Pardee's counter-motion for summary judgment, deny AGRW's cross-motion for summary judgment, and direct the Clerk of Court to enter judgment and close this case.

---

[1] ECF No. 1 at ¶ 10.

[2] *Id.* at ¶¶ 12–23.

[3] *Id.* at ¶¶ 28–34.

[4] *Id.* at ¶¶ 36–42.

[5] ECF No. 9.

[6] ECF Nos. 13 (Pardee's counter-motion), 23 (AGRW's cross-motion).

## Background

AGRW sold Pardee approximately 42 acres of unimproved land (parcels C/D and R of The Canyons at MacDonald Ranch development) in Henderson, Nevada.[7] The purchase agreement calls for Pardee to construct—and both parties to pay for—water facilities benefitting Pardee's purchased land and adjacent land owned by AGRW.[8] The parties memorialized their agreement in a written purchase agreement and amended it twice.[9] The second amendment replaces nearly all of the provisions regarding the water facilities with "intentionally omitted" and calls for the parties to sign a separate water-facilities agreement.[10] The parties signed the separate water-facilities agreement and amended it once.[11]

That agreement obligates AGRW to pay 56.4 % of the actual cost to construct the facilities and Pardee to pay the remaining 46.3 %.[12] It requires the parties to establish an escrow account for the estimated costs and to deposit set amounts into that account by certain dates.[13] It provides that AGRW "shall receive a" $1,276,148 "credit against its required payments[,] . . . which shall be applied first to the July 15, 2016 deposit and then to the April 15, 2016 deposit."[14]

The parties made the first two deposits into the estimated-cost account and then amended the agreement to make the third deposit due on the same day as the last deposit—July 15, 2016.[15] Nine days before the last two deposits were due, AGRW told Pardee that AGRW had sold its

---

[7] ECF No. 1 at ¶ 10.

[8] *Id.* at ¶¶ 12–13.

[9] *Id.* at ¶¶ 10–12, 17.

[10] *Id.* at ¶ 18; ECF No. 14-4 at 3.

[11] ECF No. 1 at ¶¶ 18, 27.

[12] ECF No. 14-5 at 3, ¶ 1.

[13] *Id.* at 5, ¶ 5.

[14] *Id.*

[15] ECF No. 1 at ¶¶ 25–27.

property that would benefit from the water facilities to Pulte Homes of St. Louis, LLC and that Pulte expected the estimated-cost account to be fully funded.[16] AGRW then demanded that Pardee pay the $1,276,148 that AGRW is credited as having deposited into the account under the agreement.[17] Pardee refused to pay the amount of AGRW's credit but deposited its remaining $1,947,307 into the account by July 15, 2016, and AGRW deposited its remaining $1,830,002 into the account by the same date.[18]

One month later, Pardee told AGRW that it expected AGRW to continue to fund its portion of the actual construction costs.[19] Pardee explained that it would invoice AGRW for actual costs incurred that exceed the amount in the estimated-cost account up to the amount of AGRW's credit ($1,276,148) and, thereafter, invoice AGRW for 56.4 % of the actual costs incurred.[20] AGRW responded that its credit offsets not only its obligation to fund the estimated-cost account but also its obligation to fund 54.6 % of the actual costs to construct the facilities.[21] It further claimed that Pardee was in default because Pardee did not deposit the amount of AGRW's credit into the estimated-cost account to render it fully funded.[22]

## Discussion

**A.    Initial considerations in a Declaratory Judgments Act case**

Pardee's only claim seeks a declaration that: (1) AGRW is required to pay 56.4 % of the actual cost to construct the water facility; (2) Pardee is not required to deposit the amount of AGRW's credit into the estimated-cost account; and (3) AGRW received a credit against its

---

[16] *Id.* at ¶¶ 28–29.

[17] *Id.*

[18] *Id.* at ¶¶ 31–32.

[19] *Id.* at ¶ 33.

[20] *Id.*

[21] *Id.* at ¶ 34.

[22] *Id.*

3

obligation to fund the estimated-cost account, but not against its obligation to fund 56.4 % of the actual construction cost.[23] The Declaratory Judgments Act ("Act") states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[24] The district court's first step in a case under the Act is to determine "whether there is an actual case or controversy within its jurisdiction."[25] If one exists, then the court must analyze the factors set out in *Brillhart v. Excess Ins. Co.*[26] and its progeny to determine whether to exercise its jurisdiction.[27]

### *1. Ripeness*

"[T]he appropriate standard for determining ripeness of private party contract disputes . . . [is] whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"[28] The parties disagree about the meaning of their agreement to jointly pay for the water facilities. The dispute centers on what effect AGRW's $1,276,148 credit has on the payment scheme. The agreements exist and the dispute arose shortly after the parties began performing their obligations under them. The dispute needs to be resolved so the parties can perform their obligations, but they are unable to resolve it on their own.

The water-facilities agreement states that Pardee is to be paid from the estimated-cost account periodically during the course of construction. Once the account is depleted, Pardee is to invoice AGRW for AGRW's share of the costs that Pardee incurs. Without knowing what effect

---

[23] ECF No. 1 at 8–9.

[24] 28 U.S.C. § 2201(a).

[25] *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005).

[26] *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942).

[27] *Principal Life Ins. Co.*, 394 F.3d at 669.

[28] *Id.* at 671 (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

4

AGRW's credit has, once the account is depleted, Pardee will be unable to determine what amount, if any, it should invoice AGRW for. The account is likely to be depleted during construction because the parties did not fully fund it. AGRW believes that Pardee is in breach because Pardee refused to deposit the amount of AGRW's credit into the account. I find that Pardee alleges a controversy of sufficient immediacy and reality between itself and AGRW.

### 2. *Brillhart* factors

"The district court's discretion to hear declaratory actions over which it has jurisdiction is guided by the Supreme Court's announcements in *Brillhart*."[29] These non-exclusive factors require the district court to: (1) "avoid needless determination of state law issues"; (2) "discourage litigants from filing declaratory actions as a means of forum shopping"; and (3) "avoid duplicative litigation."[30] Also relevant is whether the declaratory action "will settle all aspects of the controversy;" "serve a useful purpose in clarifying the legal relations at issue;" is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage;" or "will result in entanglement between the federal and state court systems."[31]

There is no proceeding pending in another forum that concerns the issues in this case. Nor is there any evidence of forum shopping. This action will settle all aspects of the parties' controversy and will clarify their legal relations under their agreements. It does not appear that this case was brought merely for a procedural advantage or would result in entanglement between federal and state court systems. Having weighed all of the factors, I find that it would be appropriate to exercise my discretion in this case. Satisfied that an actual controversy exists and that the *Brillhart* factors favor exercising jurisdiction, I now address AGRW's three dismissal arguments.

---

[29] *Id.* at 672.

[30] *Id.* (quotation marks and quoted reference omitted).

[31] *Id.* (quoted reference omitted).

5

**B.     Dismissal motion**

Rule 8 of the Federal Rules of Civil Procedure requires every complaint to contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief."[32] While Rule 8 does not require detailed factual allegations, the United States Supreme Court clarified in *Ashcroft v. Iqbal*[33] that it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." "Factual allegations must be enough to rise above the speculative level."[34] Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."[35] Mere recitals of the elements of a cause of action, supported only by conclusory statements, are insufficient; actual facts detailing the defendant's conduct and allowing the reader to draw the reasonable inference that the defendant is liable for the alleged misconduct must be pled.[36]

### *1.     Validity of a stand-alone claim for declaratory relief*

AGRW argues that a party cannot seek relief under the Act in the absence of an underlying cause of action.[37] It claims to find support in the Ninth Circuit's *Stock West, Inc. v. Confederated Tribes of the Colville Reservation* decision, which states that the Act "only creates a remedy and is not an independent basis for jurisdiction."[38] But AGRW reads too much into this statement and takes it out of its purely jurisdictional context. To determine if a stand-alone claim for declaratory judgment can be considered by a federal court sitting in diversity, I look back 67

---

[32] Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007).

[33] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

[34] *Twombly*, 550 U.S. at 555.

[35] *Iqbal*, 129 S. Ct. at 1949 (internal citation omitted).

[36] *Id*.

[37] ECF No. 9 at 9–10.

[38] *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989).

6

years to the Supreme Court's decision in *Skelly Oil Co. v. Phillips Petroleum Co.*[39] There, Phillips Petroleum Co. sued several gas companies under the Act seeking a declaration that the contracts between Phillips and each defendant remained in effect.[40] The defendants moved to dismiss, arguing that the district court lacked subject-matter jurisdiction.[41] The district court denied the dismissal motions, proceeded on the merits, and decreed that the contracts remained in effect.[42] The Tenth Circuit affirmed and the Supreme Court took the appeal "because it raise[d] in sharp form the question whether a suit like this 'arises under the Constitution, laws or treaties of the United States,' so as to enable District Courts to give declaratory relief under the . . . Act."[43]

The Supreme Court found that the district court lacked jurisdiction over two of the defendants because they were not diverse from Phillips, and the Act did not itself confer federal subject-matter jurisdiction.[44] The Court reversed the judgment as to them and remanded "with directions that the cause be dismissed" against them.[45] But the Supreme Court found that a "different situation [was] presented" by the third defendant because it was diverse from Phillips. With jurisdiction established, the Court found that it "must reach the merits" of Phillips's declaratory relief claim against the diverse defendant.[46] Finding that the Tenth Circuit's "grammatical argument" interpreting the contract in favor of Phillips was "given more weight

---

[39] *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950).

[40] *Id.* at 670–71.

[41] *Id.* at 671.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 671–74.

[45] *Id.* at 678.

[46] *Id.* at 674.

7

than it [could] bear[,]" the Court vacated the judgment as to the diverse defendant and remanded for further proceedings as to it.[47]

Although the Supreme Court does not expressly state in *Skelly Oil* that a district court can entertain a stand-alone claim under the Act so long as subject-mater jurisdiction independently exists, the takeaway from the decision is that it can. The Court explained that the Act is a "procedural" tool that allows federal courts sitting in diversity to "entertain a suit on a contract" and give relief by "recognizing the plaintiff's right even though no immediate enforcement of [the contract] [is] asked."[48] In these circumstances, the failure to assert an underlying claim is not fatal to Pardee's request for declaratory relief.

### 2. *Complaining about past wrongs*

AGRW argues that dismissal is warranted because Pardee seeks to redress past wrongs, not to declare future rights.[49] The purpose of the Act is to bring "to the present a litigable controversy" that "otherwise might only be tried in the future."[50] As one district court explained and the Ninth Circuit quoted with approval, the Act "was designed to relieve potential defendants from the Damoclean threat of impending litigation [that] a harassing adversary might brandish, while initiating suit at his leisure or never."[51] "The Act permits parties so situated to forestall the accrual of potential damages by suing for a declaratory judgment, once adverse positions have crystallized and the conflict of interests is real and immediate."[52]

---

[47] *Id.* at 676.

[48] *Id.* at 671–72.

[49] ECF No. 9 at 10–12.

[50] *Societe de Conditionnement en Aluminum v. Hunter Engineering Co., Inc.*, 655 F.2d 938, 943 (9th Cir. 1981).

[51] *Id.* (quoting *Japan Gas Lighter Ass'n v. Ronson Corp.*, 257 F. Supp. 219, 237 (D. N.J. 1966)).

[52] *Id.* (quoting *Japan Gas Lighter Ass'n*, 257 F. Supp. at 237).

AGRW singles out Pardee's request for a declaration that it is not obligated to deposit the amount of AGRW's credit into the estimated-cost account. As pled, Pardee's claim does not seek to redress past wrongs (e.g., to adjudicate AGRW's past conduct) but to affect AGRW's future behavior toward Pardee like suing it for breach of contract. Pardee's claim is consistent with the Act's purpose.

### 3. *Not complaining about ambiguity*

AGRW also argues that the complaint does not sufficiently state a claim for declaratory relief because Pardee does not allege that the agreement is ambiguous, only that the parties dispute how it should be interpreted.[53] Pardee characterizes AGRW's argument as confusing.[54] I agree. Pardee is not required to allege that the agreement is ambiguous to sufficiently plead that a real and immediate controversy exists between it and AGRW about how to interpret it. Pardee sufficiently pleads a claim for declaratory relief under the Act. I therefore deny AGRW's motion to dismiss.

## C. Summary-judgment motions

Each side argues that Pardee's declaratory-relief claim can be summarily adjudicated because the written agreement favors its interpretation. "In the absence of ambiguity or other factual complexities, contract interpretation presents a question of law that the district court may decide on summary judgment . . . ."[55] "Whether a contract is ambiguous likewise presents a question of law."[56] "A contract is ambiguous if its terms may reasonably be interpreted in more than one way."[57] "[A]mbiguity does not arise simply because the parties disagree on how to

---

[53] ECF No. 9 at 12–16.

[54] ECF No. 12 at 18–20.

[55] *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013) (quotation marks and quoted reference omitted).

[56] *Id.*

[57] *Id.*

9

interpret their contract."[58]  "Rather, an ambiguous contract is an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning."[59]  "Contract interpretation strives to discern and give effect to the parties' intended meaning."[60]

The water-facilities agreement obligates AGRW to pay 56.4 % of the actual costs to construct the water facilities and obligates Pardee to pay the remaining 43.6 %.[61]  The parties estimated in the agreement that it will cost $9,053,457 to construct the facilities.[62]  The agreement requires the parties to establish an escrow account into which Pardee is required to deposit $3,947,307 (43.6%) of the estimated construction cost and AGRW to deposit the remaining $5,106,150 (56.4%).[63]  And it states that AGRW "shall receive a credit against its required payments equal to . . . $1,276,148[ ], which shall be applied first to the July 15, 2016 deposit and then to the April 15, 2016 deposit."[64]

The parties agree about these basic points.  Where they diverge is what effect AGRW's $1,276,148 "credit" has on the overall payment scheme.  Pardee interprets the agreement to mean that AGRW gets to defer part of its payment obligations (i.e., AGRW gets a credit against its obligation to fund 56.4 % of the estimated-cost account but not against its obligation to fund 56.4 % of the actual construction costs).  AGRW interprets the agreement to mean that it gets a credit against all of its payment obligations (i.e., AGRW gets a credit against its obligation to fund $5,106,150 of the estimated-cost account, which carries forward to its obligation to fund 56.4 %

---

[58] *Id.*

[59] *Id.* (quotation marks and quoted reference omitted).

[60] *Id.* at 367.

[61] ECF No. 14-5 at 3, ¶ 1.

[62] *Id.*  The full estimate is $10,529,437, but that includes Pardee's management fee and the "Parcel F Costs" that the parties agree are not at issue here.

[63] *Id.* at 5, ¶ 5.

[64] *Id.* at 5, ¶ 5.

10

of the actual construction costs). The effect that the parties intended AGRW's credit to have turns on what they meant by "required payments" in the clause dictating that AGRW "shall receive a credit against its required payments equal to . . . $1,276,148[ ] . . . ."[65]

"Words derive meaning from usage and context."[66] The term "required payments" is used only once in the agreement. Two sentences later but still in the same paragraph, the agreement provides that "[t]he parties acknowledge and agree that they will each pay their pro rata share of the actual Water Facilities Costs, whether or not such costs differ from the amounts shown in the Cost Estimate and deposited in the Water Facilities Escrow Account."[67] The agreement then sets forth how the actual construction costs will be paid. It obligates Pardee to provide periodic invoices to AGRW and the escrow holder.[68] Within 10 "days following receipt of such invoices, supporting detail and lien releases," the escrow holder is required to pay Pardee "the amount shown on the invoice out of the Water Facilities Escrow Account, and if the amount in the Water Facilities Escrow Account is insufficient, [AGRW] shall pay its share of the remaining amount owed directly to [Pardee]."[69] The paragraph next discusses how any funds remaining in the estimated-cost account after the water facilities are completed should be distributed.[70] It concludes by providing that, at Pardee's request, Pardee and AGRW shall make additional deposits into the estimated-cost account from time to time if necessary to cover the actual construction costs.[71]

---

[65] ECF No. 14-5 at 5, ¶ 5.

[66] *Galardi*, 301 P.3d at 367.

[67] ECF No. 14-5 at 5–6, ¶ 5.

[68] *Id.* at 6, ¶ 5.

[69] *Id.*

[70] *Id.*

[71] *Id.*

The manner and context in which "required payments" is used favors Pardee's interpretation that it refers only to AGRW's obligation to fund the estimated-cost account. I find that the agreement plainly sets forth two separate payment obligations: (1) pay into the estimated-cost account and (2) pay the actual construction costs. AGRW's $1,276,148 credit is not mentioned in the context of the parties' obligations to pay the actual costs. The only time it is discussed is in the context of the parties' obligations to fund the estimated-cost account. There is no language applying AGRW's credit to its separate obligation to fund 56.4 % of the actual costs. Instead, after setting forth (1) the parties' obligations to fund the estimated-cost account, (2) the amount of AGRW's credit, and (3) what happens if the parties are delinquent in their obligations to fund the estimated-cost account, the agreement expressly states that "[t]he parties acknowledge and agree that they will each pay their pro rata share of the actual Water Facilities Costs, *whether or not such costs differ from the amounts shown in the Cost Estimated and deposited in the Water Facilities Escrow Account*."[72] This provision appears to be an acknowledgment that the parties' obligations with respect to the estimated-cost account and the actual construction costs are separate and distinct. And it belies AGRW's argument that the intention of the deal was to give AGRW a credit that reduces both its obligation to fund the estimated-cost account *and* its obligation to fund 56.4 % of the actual construction costs.

The agreement also cannot reasonably be interpreted to obligate Pardee to tender payment in an amount equal AGRW's credit into the estimated-cost account. The agreement is devoid of language obligating Pardee to tender any such payment. Instead, the plain language obligates Pardee to pay a total of $3,947,307 into the account and AGRW to pay a total of $5,106,150 of which $1,276,148 AGRW is credited as having timely deposited. The agreement clearly contemplates that the estimated-cost account will be underfunded by the amount of AGRW's credit, not that Pardee will make-up the deficit.

---

[72] *Id.* at 5–6, ¶ 5 (emphasis added).

12

The upshot is that I agree with the parties that their agreement is unambiguous, and it is Pardee's interpretation that I find accurate.[73]  The plain language gives AGRW a credit that reduces its obligation to fund the estimated-cost account but not its obligation to ultimately pay 56.4 % of the actual construction costs.  The plain language also does not obligate Pardee to shoulder the cost of AGRW's credit by depositing it into the estimated-cost account.  I therefore grant Pardee's counter-motion for summary judgment and deny AGRW's cross-motion seeking the same relief.

**Conclusion**

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that AGRW's motion to dismiss **[ECF No. 9] is DENIED**, Pardee's counter-motion for summary judgment **[ECF No. 13] is GRANTED**, and AGRW's cross-motion for summary judgment **[ECF No. 23] is DENIED**.

The court **DECLARES** that AGRW's $1,276,148 credit reduces AGRW's obligation to fund the estimated-cost account, but does not reduce AGRW's obligation to fund 56.4 % of the actual costs to construct the water facilities.

The court further **DECLARES** that Pardee satisfied its obligation to deposit a total of $3,947,307 into the estimated-cost account and it is not obligated to also deposit the amount of AGRW's credit into that account.

The Clerk of Court is directed to **ENTER JUDGMENT** in favor of Pardee and against AGRW consistent with this order and to **CLOSE** this case.

DATED: July 6, 2017.

_____
U.S. District Judge Jennifer A. Dorsey

---

[73] Because I find that the parties' agreement is not reasonably susceptible to more than one interpretation, I do not consider the extrinsic evidence they offered to show intent.